1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CHRISTOPHER BUCHANAN,

      Plaintiff,

  v.

GENENTECH, INC.,

      Defendant.
_____/

No. 09-01454 CW

ORDER GRANTING
DEFENDANT'S
MOTION FOR
SUMMARY JUDGMENT

    In this employment discrimination case, Plaintiff Christopher Buchanan sues Defendant Genentech for race discrimination. Defendant has filed a motion for summary judgment arguing that Plaintiff's claims are not supported by admissible evidence. Defendant asserts that the decisions not to promote Plaintiff and, later, to terminate him, were supported by legitimate non-discriminatory reasons. Plaintiff opposes the motion. Having considered all of the papers filed by the parties and oral argument on March 5, 2009, the Court GRANTS Defendant's motion.

BACKGROUND

    Plaintiff began working for Genentech in the Single Point of Contact Division (SPOC) as a data reimbursement specialist in 2004. SPOC provided assistance to Genentech's patients in getting

United States District Court
For the Northern District of California

reimbursed by insurance companies for Genentech's biopharmaceuticals. SPOC was divided into various teams according to Genentech's brands of medications. Plaintiff was employed on the team for Raptiva, a psoriasis medication. In 2006, Genentech restructured its teams and, instead of working on a team aligned with a particular drug, Plaintiff and all other data reimbursement specialists were transferred to the Reporting Analytics Team. This team was led by Norm Bartlett, the team manager, who reported to Kerry Slattery, the senior Manager of Quality, Process and Training (QPT). Plaintiff's new title was data analyst and his primary function was to produce reports, respond to data queries and assist business analysts. A business analyst's primary function was to interface with internal Genentech clients to develop strategies for business plans. Data analysts were classified as E1 employees,[1] whereas business analysts were E2s, E3s and E4s.

In his 2006 annual review, Plaintiff received a "partially meets expectation" evaluation of his overall performance. Richardson Decl., Exh. C at 15.[2] Plaintiff's review noted that he "can sometimes have a lackadaisical attitude about priorities that can be very frustrating. At times, he seems to have no sense of urgency about his work and deadlines." Id. at 12. As a specific example, one of Plaintiff's job duties was to produce daily data

---

[1]E1 indicates the first level of overtime exempt employees. The higher the number associated with "E," the more responsibility and seniority an employee had.

[2]An employee's overall performance was rated on a five-measure scale: does not meet expectations, partially meets expectations, meets expectations, exceeds expectations and exceptional performance.

reports from an outside vender, Harte-Hanks, which collected data from pharmacies and customer lists to provide networking opportunities for patients.  During 2006, Plaintiff failed to run the daily Harte-Hanks reports on several occasions.  Although Plaintiff does not dispute his failure to run daily Harte-Hanks reports, he disagrees that he deserved a "partially meets expectations rating."  In the self-assessment area of the review, he rated himself as "meets expectations."  He stated that the comments in his review about the Harte-Hanks reports failed to "adequately address the ~250 times that this very manual, multi-step, multi-product feed was completed correctly throughout the 2006 year.  A number of times, there were issues with the vender's system, but due to the automated error handling system at the vender this incorrectly reflected poorly upon me." Id. at 16.

In 2007, Genentech sought to hire two business analysts in the QPT division.  Plaintiff applied for the position but was not selected.  Instead, Bartlett hired two already-established E3 business analysts, Dina Ciarlo and Amanda Carlson (both white), from other groups within Genentech.  Bartlett agreed to help identify ways that Plaintiff could "grow into the more advanced Business Analyst role."  Bartlett Decl. ¶ 3.  Bartlett informed Plaintiff about an organization-wide project which analyzed all positions at Genentech to ensure that all job salaries and duties were similar to those in the industry.  This process was known as the Career Pathing Initiative (CPI) and was conducted by Genentech's Human Resources Department.  Slattery told Plaintiff that if he performed well in the first quarter of 2008, he would

receive a promotion to the position of a business analyst.

In January, 2008, Plaintiff began reporting to Danielle Sheehan, who had been a lead business analyst in the QPT group and was promoted to a supervisor position in 2007.  In the spring of 2008, Sheehan left her supervisor position and Slattery took over direct supervision of all analysts, including Plaintiff.  However, because Bartlett had supervised Plaintiff for most of 2007, he wrote Plaintiff's 2007 performance review.  Bartlett gave Plaintiff an overall rating of "meets expectations," which was higher than the previous year's "partially meets expectations," but not as high as Plaintiff's self-evaluation for 2007 of "exceeds expectations." Richardson Decl., Exh. A, Buchanan Dep. 139:24-140:5.  Although Bartlett did not have authority to determine whether Plaintiff would receive a raise for his performance in 2007, he advocated to his supervisors that Plaintiff should receive a "higher-than-expected bonus in 2007 because of the technical work he had done during the year."  Bartlett Decl. ¶ 19.  Plaintiff's raise was eventually approved by Bartlett's supervisors.  Id.

Throughout the first several months of 2008, Plaintiff expressed concern about his 2007 performance review.  He met with Slattery and Bartlett on at least two occasions, and he separately met with Slattery for several weeks in a row to discuss the review. Plaintiff wrote a formal rebuttal to the review and Slattery eventually referred this issue to Genentech's Employee Relations Department, which investigates employees' concerns about performance reviews.  After investigating the matter, the department concluded that the performance review was fair and had

4

been conducted in accordance with Genentech policy.

On April 21, 2008, Slattery offered Plaintiff a promotion to the position of business analyst and a five percent pay raise. Richardson Decl., Exh. A 148:8-10, 161:7-162:11, Exh. 14. Plaintiff declined the promotion because he believed that, even with the five percent pay raise, his work was undervalued.  He wanted to be sure that he was fairly compensated for his work, and Slattery told him that, if he accepted the pay raise, he would not find out the results of the CPI and whether his current job was compensated at a rate close to that of employees similarly situated in the industry.  Id. at 163-165.

At some point after Plaintiff declined the promotion, he met with Bartlett and Sheehan to discuss particular aspects of his job duties.  Plaintiff stated that he was asked to perform work that required "higher technical knowledge than [he] was hired to do." Id. 86:1-5.  With respect to a particular project known as the data feed project or the "BioOnc project," Plaintiff had to add oncology data to the Harte-Hanks report.  Plaintiff believed that this additional work required technical expertise above his level.  Id. at 114-115.  Plaintiff asked to be removed from the project because "it was getting very, very technical."  Id. at 114.  On May 19, Slattery notified Plaintiff by email that he was removed from that project.  Even though Plaintiff had asked to be removed from this project, he responded to Slattery's notification by stating, "I want clarification on the reasoning as to why I am being pulled off this project after investing substantial work hours, weekends and my Christmas break into this."  Richardson, Exh. L.  Slattery

responded that they would discuss the issue in person during a "project debrief" later in the week. <u>Id.</u> The following day, Plaintiff emailed Harte-Hanks directly and wrote,

> All,
>     I am no longer working on this project as my priorities have changed once again. Either Norm Bartlett or Kerry Slattery can give further insight as to continuation of this project.

<u>Id.</u>, Exh. M. Slattery told Plaintiff that this email was "not appropriate," and that the two would discuss it further in a one-on-one meeting. Slattery was concerned that this email suggested to Harte-Hanks and other clients copied on the email that nobody was in charge of the project. Plaintiff responded, "This email is absolutely appropriate." He also stated, "What is also inappropriate is your email where you try to distance yourself from this poor decision." Slattery Decl., Exh. E. Slattery concluded that Plaintiff's tone in these emails was "insubordinate." Slattery Decl. ¶ 20.[3]

In a later meeting in which Slattery and Plaintiff discussed Plaintiff's upcoming projects, Slattery asked Plaintiff to provide support to business analysts on their projects. On May 30, 2008, Plaintiff emailed the business analysts and Slattery the following:

> All,
>     As part of my new and improved job duties, Kerry tells me that I am to solicit work from each of you. So consider me as your friendly neighborhood field slave begging for work to buy new patches for my pants. If you have any tasks/work/manual labor/minstrel shows for me to complete,

_____

[3]To the extent that the Court relied upon evidence to which the parties objected, the objections are overruled. The Court did not rely on any inadmissible evidence in reaching its decision. To the extent the Court did not rely on evidence to which the parties objected, the objections are overruled as moot.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    please relay that to me and/or Kerry.

2  Richardson Decl., Exh. N.  Slattery believed that this email

3  violated Genentech's policies and operating procedures because it

4  was insubordinate, failed to reflect dignity and respect and

5  contained offensive language.  Slattery claimed that it also

6  violated Genentech's anti-harassment policy that prohibits the use

7  of racially charged language in the workplace.

8    On June 2, 2008, Slattery gave Plaintiff a misconduct notice.

9  The notice stated that Plaintiff "demonstrated unacceptable

10  workplace behavior by sending an email to [his] colleagues using

11  unprofessional language."  Richardson Decl., Exh. O.  It noted

12  that, in addition to the email, he used unprofessional language in

13  a meeting with Slattery when he characterized the work he was

14  assigned as "manual labor."[4]  The notice stated that Plaintiff's

15  email was a "direct violation of the Non-Harassment Policy located

16  in Genentech's Good Operating Procedures (GOP) which states:

17  Prohibited unlawful harassment includes, but is not limited to, any

18  of the following behavior: Verbal conduct such as epithets,

19  derogatory jokes or comments . . . ."  Id.  The notice stated that

20  the email was also a "direct violation of the Employment Behavior

21  guidelines located in the Genentech's Good Operating Procedures

22  which states: 'Avoid any establishment or activity that a

23  reasonable participant might find offensive or intimidating.'"

24  Plaintiff was required to apologize in writing and in person to

25  _____

26    [4]The notice also states that, at this meeting, Plaintiff
referred to the work assigned to him as "negro field hand work."
27  Plaintiff denies making this comment and Defendant does not rely on
this comment in its motion.

28                                7

**United States District Court**
For the Northern District of California

Slattery and every recipient of his May 30 email.  Id.  Plaintiff never apologized to these individuals.  Richardson Decl., Exh. A at 202-03.

On June 30, 2008, Slattery and James Deslonde from the human resources department met with Plaintiff to discuss the results of the Career Pathing Initiative (CPI).  The CPI concluded that the work of a data analyst should be transferred to the Corporate Information Technology Services Division of Genentech and that Plaintiff should be considered a business analyst.  Slattery and Deslonde decided that Plaintiff would be an E2 business analyst and that his current salary was in line with this classification. Richardson Decl., Exh. A at 229-231.

Soon after his meeting with Slattery and Deslonde, Plaintiff went on vacation for three weeks.  When he returned, a problem arose with the Harte-Hanks report.  Slattery asked Plaintiff to describe what happened and to provide a plan of action to ensure that the problem would not happen again in the future.  Plaintiff responded, "Kerry, it's obvious that you have little idea what we are talking about."  Richardson Decl., Exh. Q.

A few days later, on July 30, 2008, Plaintiff met with Slattery and Laura Chavaree, Slattery's supervisor, to discuss Plaintiff's mid-year review.  The review detailed Plaintiff's acts of insubordination, including his refusal to abide by the terms of the misconduct notice.  The review stated, "Overall, Chris['s] tone and language in emails and meetings with his manager and other team members is unprofessional and at times insubordinate.  In meetings, he has repeatedly raised his voice, interrupted, disagreed with

8

**United States District Court**
For the Northern District of California

feedback and used intimidating and threatening language."
Richardson Decl., Exh. T at 5.

Plaintiff challenged the accuracy of the report and stated
that the comments in it "represent a personal attack and do not
make any mention to the quality or technical nature of my
projects." Chavaree Decl., Exh. A at 7. Slattery and Chavaree
decided that Plaintiff was too difficult to manage and, on August
5, 2008, they terminated him for insubordination.

Plaintiff claims that, while both were working for Genentech,
Bartlett made several racist comments to him. On one occasion,
when Plaintiff was talking about his children and girlfriend (to
whom he referred by name and not as his "girlfriend"), Bartlett
asked Plaintiff if he was married. Plaintiff thought this question
was racist because it derived from the "assumption that black men
have out-of-wedlock children." Id. at 60-61. On another occasion,
during one of the weekly meetings between Bartlett and Plaintiff in
which Plaintiff's weekly tasks were discussed, Bartlett said to
Plaintiff, "There's something about you that I cannot put my finger
on" and "I have a bias against you and your work." Id. at 62.
Bartlett claims that this comment was made in the context of
discussing his bias of analyzing issues from a highly technical
perspective. Plaintiff cannot recall when either of these comments
was made, but believes that the marriage comment was made within
the first six months of reporting to Bartlett as his supervisor.
Id. at 59, 63. Plaintiff presents evidence that he discussed the
"bias" comment in a meeting with Bartlett and Slattery on June 30,
2008. Rogers Decl., Exh. 1, Buchanan Dep., Exh. 29.

9

**United States District Court**
For the Northern District of California

1    Plaintiff alleges seven causes of action under federal and

2    California law, including race discrimination, retaliation, and

3    failure to prevent race discrimination and retaliation, under both

4    Title VII and the Fair Employment and Housing Act (FEHA) and a

5    California common law claim of wrongful termination in violation of

6    public policy premised on these statutory claims.  Plaintiff

7    complains of Defendant's (1) failing to promote him to business

8    analyst and (2) terminating him.  Defendant now moves for summary

9    adjudication of all claims made against it.

10                          LEGAL STANDARD

11    Summary judgment is properly granted when no genuine and

12    disputed issues of material fact remain, and when, viewing the

13    evidence most favorably to the non-moving party, the movant is

14    clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.

15    56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

16    Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.

17    1987).

18    The moving party bears the burden of showing that there is no

19    material factual dispute.  Therefore, the court must regard as true

20    the opposing party's evidence, if supported by affidavits or other

21    evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815

22    F.2d at 1289.  The court must draw all reasonable inferences in

23    favor of the party against whom summary judgment is sought.

24    Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

25    587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d

26    1551, 1558 (9th Cir. 1991).

27    Material facts which would preclude entry of summary judgment

28                               10

are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim.  Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it

United States District Court
For the Northern District of California

must produce affirmative evidence of such negation.  <u>Nissan</u>, 210 F.3d at 1105.  If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists.  <u>Id.</u>

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition.  <u>Id.</u> This is true even though the non-moving party bears the ultimate burden of persuasion at trial.  <u>Id.</u> at 1107.

DISCUSSION

Although Plaintiff has filed several causes of action, his claims can be separated into two categories, discrimination claims and retaliation claims.  The Court addresses the discrimination claims first.

I.   Discrimination Claims

Defendant moves for summary adjudication of Plaintiff's discrimination claims on the grounds that Plaintiff (1) offered no evidence suggesting that Defendant acted with a discriminatory motive and (2) failed to rebut Defendant's legitimate, non-discriminatory reasons for failing to promote him and terminating him.

A.   Applicable Law

In <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973), and <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981), the Supreme Court established a burden-shifting framework for evaluating the sufficiency of plaintiffs' evidence in employment discrimination suits.  The same burden-shifting

12

United States District Court
For the Northern District of California

framework is used when analyzing claims under FEHA.  Bradley v. Harcourt, Brace & Co., 104 F.3d 267, 270 (9th Cir. 1996) (FEHA). Within this framework, plaintiffs may establish a prima facie case of discrimination by reference to circumstantial evidence; to do so, plaintiffs must show that they are members of a protected class; that they were qualified for the position they held or sought; that they were subjected to an adverse employment decision; and that they were replaced by someone who was not a member of the protected class or that the circumstances of the decision otherwise raised an inference of discrimination.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993) (citing McDonnell Douglas and Burdine).  Once plaintiffs establish a prima facie case, a presumption of discriminatory intent arises.  Id.  To overcome this presumption, defendants must come forward with a legitimate, non-discriminatory reason for the employment decision.  Id. at 506-07. If defendants provide that explanation, the presumption disappears and plaintiffs must satisfy their ultimate burden of persuasion that defendants acted with discriminatory intent.  Id. at 510-11.

To survive summary judgment, plaintiffs must then introduce evidence sufficient to raise a genuine issue of material fact as to whether the reason the employer articulated is a pretext for discrimination.  Plaintiffs may rely on the same evidence used to establish a prima facie case or put forth additional evidence.  See Coleman v. Quaker Oats Co., 232 F.3d 1271, 1282 (9th Cir. 2000); Wallis v. J.R. Simplot Co., 26 F.3d 885, 892 (9th Cir. 1994). However, "in those cases where the prima facie case consists of no more than the minimum necessary to create a presumption of

United States District Court
For the Northern District of California

discrimination under McDonnell Douglas, plaintiff has failed to raise a triable issue of fact." Wallis, 26 F.3d at 890.

Plaintiffs can provide evidence of "pretext (1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." Raad v. Fairbanks N. Star Borough Sch. Dist., 323 F.3d 1185, 1194 (9th Cir. 2003) (citation and internal quotation marks omitted).  When plaintiffs present indirect evidence that the proffered explanation is a pretext for discrimination, "'that evidence must be specific and substantial to defeat the employer's motion for summary judgment.'"  EEOC v. Boeing Co., 577 F.3d 1044, 1049 (9th Cir. 2009) (quoting Coghlan v. Am. Seafoods Co. LLC, 413 F.3d 1090, 1095 (9th Cir. 2005)).  When plaintiffs proffer direct evidence that the defendants' explanation is a pretext for discrimination, "very little evidence" is required to avoid summary judgment.  Boeing, 577 F.3d at 1049.

The Ninth Circuit has instructed that district courts must be cautious in granting summary judgment for employers on discrimination claims.  See Lam v. Univ. of Hawai'i, 40 F.3d 1551, 1564 (9th Cir. 1994).  ("'We require very little evidence to survive summary judgment' in a discrimination case, 'because the ultimate question is one that can only be resolved through a "searching inquiry"-- one that is most appropriately conducted by the factfinder'") (quoting Sischo-Nownejad v. Merced Cmty. Coll. Dist., 934 F.2d 1104, 1111 (9th Cir. 1991)).

14

B.    Analysis

The Court separately analyzes Defendant's decision not to promote Plaintiff and its decision to terminate him.

Plaintiff's discriminatory failure to promote claim is without merit.  He challenges his non-promotion in March, 2007 when he was not selected for the E3 positions that went to two white Genentech employees.  At the time Plaintiff applied for the positions, he was an E1 level employee, and the two employees who got the positions were already E3 level employees.  Thus, Plaintiff was less qualified for the positions for which he applied and he presents no evidence of a prima facie case related to these positions. Similarly, Plaintiff presents no evidence that the reasons Defendant gave for its decision not to promote him to an E3 position were pretextual.

Plaintiff also asserts that Defendant discriminated against him in the manner that it handled his application "for a releveling of his position."  Opp. at 10.  However, Plaintiff did not "apply" for any releveling of his position.  The Court assumes that Plaintiff is referring to the CPI, in which the human resources department analyzed every job title to determine if employees were accurately categorized and compensated consistent with industry standards.  Although Plaintiff does not clearly state his claim, it appears that he is arguing that he should have been releveled before the results of the CPI were concluded.  However, Plaintiff does not present any evidence that anyone at Genentech frustrated the CPI process or his attempt to be releveled during this process. Further, Plaintiff has not presented any evidence that he lost

15

compensation or job opportunities because he was not releveled earlier.

Plaintiff also complains that he was not given any assignments which would have allowed him to develop and showcase his skills and put him in a position for a promotion, but he never asked for such assignments. To the contrary, he asked to be removed from an assignment that he felt was too technical. In sum, Plaintiff has not presented evidence that any employee at Genentech failed to promote him because of his race.

Defendant does not dispute that Plaintiff's evidence establishes a prima facie case of discrimination with respect to the termination decision. See Motion at 15-16; Reply at 4. It is also undisputed that the decision-makers on his termination were Slattery and Chavaree. Further, Plaintiff does not dispute that Defendant met its burden to articulate a legitimate, non-discriminatory reason for his termination, which was Plaintiff's insubordination and unprofessional misconduct. Instead, Plaintiff asserts that these reasons were merely a pretext for the real reason for discharging him, his race. However, Plaintiff does not identify any evidence which would allow a jury to make a reasonable inference that the reasons given for the decision to terminate him were pretextual. Plaintiff points to a few incidents during meetings when Slattery slowly moved her chair in the direction away from him. Plaintiff does not provide any context or further descriptions of these meetings. On its own, moving a chair away from an individual during a meeting does not imply race discrimination. Further, it is undisputed that Slattery met with

16

Plaintiff on numerous times without such chair-moving activity.

Plaintiff also claims that the fact that Slattery was "an extremely difficult person to communicate with" led him to believe that she was discriminating against him because of his race.  Opp. at 4.  However, Plaintiff does not suggest that it was more difficult for him to communicate with Slattery because he is African American.  The evidence Plaintiff relies on to support his argument is a few minutes of Slattery's deposition during which she interacted with Plaintiff's counsel, who is white.  This evidence does not suggest racial discrimination.  Plaintiff also argues that Slattery exhibited a racial bias against him after he declined the promotion.  However, there is simply no evidence of this.

Plaintiff suggests that Bartlett harbored a racial bias against Plaintiff and that Bartlett supplied "false information" about Plaintiff to Slattery.  Yet, Plaintiff does not identify any false information Bartlett provided to Slattery that led to Plaintiff's termination.

Plaintiff points to Bartlett's comments during a discussion about his work performance as evidence of his racial bias. Bartlett made the following comments: "There's something about you that I cannot put my finger on" and "I have a bias against you and your work."  Richardson Decl., Exh. A at 62.  Although Bartlett was not involved in the decision to terminate Plaintiff, these comments are relevant because Plaintiff and Bartlett discussed them with Slattery, who was involved in the termination decision.  Plaintiff argues that these comments were racist because Bartlett used the word "you" to refer to Plaintiff.  Richardson Decl., Exh A. at 68.

17

United States District Court
For the Northern District of California

Although a strange comment to make to someone when discussing work performance, by itself, a comment about having a bias against another person does not establish racial bias. Similarly, Bartlett's question to Plaintiff about whether he was married does not lend itself to an inference of race discrimination.[5]

Plaintiff does not present any evidence that Chavaree, who ultimately approved Slattery's recommendation to terminate Plaintiff, exhibited any racial bias against him. In sum, because Plaintiff has not pointed to any evidence that the reasons given for his termination were pretextual, his discrimination claim based on his termination fails.

Plaintiff's speculation that his failure to receive a promotion or his termination was motivated by race discrimination does not constitute "specific, substantial evidence" that Defendant's actions were discriminatory. Steckl, 703 F.2d at 393. Plaintiff has not established a prima facie case for his failure to promote claim and he has not identified for the Court evidence sufficient to raise a genuine issue of material fact as to whether the reasons Defendant articulated for either his non-promotion or his termination are a pretext for discrimination. Thus, the Court grants Defendant summary adjudication as to Plaintiff's race discrimination claims.

II.  Retaliation Claim

In order to establish a prima facie claim for retaliation, a plaintiff must show that (1) he engaged in protected activity,

---

[5]Plaintiff has not presented any evidence that Slattery or Chavaree had any knowledge of the marriage comment.

United States District Court
For the Northern District of California

(2) the employer subjected him to an adverse employment decision, and (3) there was a causal link between the protected activity and the employer's action. Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 506 (9th Cir. 2000). The protected activity must be some sort of protest or opposition to unlawful employment discrimination directed against the employee. Moyo v. Gomez, 40 F.3d 982, 984 (9th Cir. 1994). In determining whether conduct is protected, a court must balance "the purpose of [Title VII] to protect persons engaging reasonably in activities opposing . . . discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." Wrighten v. Metropolitan Hospitals, 726 F.2d 1346, 1355 (9th Cir. 1984) (quotation marks and citations omitted). "An employee's opposition activity is protected only if it is 'reasonable in view of the employer's interest in maintaining a harmonious and efficient operation.'" O'Day v. McDonnell Douglas Helicopter Co., 79 F.3d 756, 763 (9th Cir. 1996) (quoting Silver v. KCA, Inc., 586 F.2d 138, 141 (9th Cir. 1978).

Plaintiff argues that, after he declined the April 21, 2008 promotion to business analyst, Slattery retaliated by taking projects away from him. However, this does not amount to evidence that Slattery's actions were in retaliation for any protected activity. Plaintiff's declination of the promotion was not protected activity under Title VII or FEHA. The evidence establishes that Slattery took away work from Plaintiff only in response to Plaintiff's request to be removed from highly technical projects.

19

Plaintiff also claims that Slattery took work away from him in response to his internal complaints about racial discrimination. Plaintiff met with a human resources representative in May or June, 2008 to discuss Bartlett's comments about having a bias against him. However, by this time, the projects had already been taken away from Plaintiff. Therefore, even if Plaintiff's complaint to the human resources representative was protected activity and the decision to reduce his workload was an adverse action, the alleged retaliation cannot have been caused by the meeting with the human resources representative.

Lastly, Plaintiff argues that his May 30 "field slave" email was protected activity. Plaintiff relies on Wrighten v. Metropolitan Hospitals. 726 F.2d 1346. Wrighten, an African-American nurse, believed that her hospital employer had instituted policies that compromised the care of African-American patients. After making internal complaints to hospital administrators, she held a news conference to voice her concerns. She was later terminated and she sued for retaliation. The Ninth Circuit held that, because Wrighten met with the affirmative action officer and hospital president several times before taking her complaint public, her comments during the news conference were protected. Id. at 1355.

This case is distinguishable. Wrighten clearly engaged in protected activity. In contrast, it is not clear that Plaintiff's email, with its sarcastic tone and inappropriate remarks in the context of asking for work projects, can even be read to be a complaint about race discrimination. Plaintiff himself did not

20

consider his email to be "racially charged," and he cannot recall whether, when writing the email, he considered it to be a complaint of race discrimination.  Richardson Decl., Exh. A at 210.  He did not follow up his email with any complaint to the human resources department.  Rather, a human resources representative contacted Plaintiff to discuss the email and its ramifications.

Further, unlike Wrighten's activity, Plaintiff's email directly violated Genentech's policies prohibiting racially inappropriate communications in the workplace.  Title VII protects "reasonable attempts to contest an employer's discriminatory practice; it is not an insurance policy, a license to flaunt company rules . . . ."  O'Day, 19 F.3d at 763-64.  Plaintiff's email was not a "reasonable attempt" to challenge a discriminatory act of Genentech.  See Matima v. Celli, 228 F.3d 68, 79 (2d Cir. 2000) ("unseemly confrontations between [employee] and supervisors" not protected); Miller v. American Family Mut. Ins. Co., 203 F.3d 997, 1009 (7th Cir. 2000) (holding that an employee who called her supervisor incompetent and a political hack "had a right to engage in protected conduct without fear of retaliation, but when she says something obviously inappropriate and unprotected, she is not insulated from being fired.").  Like any employer, Genentech "has a strong interest in maintaining employee morale, and in discouraging this sort of behavior."  O'Day, 19 F.3d at 763.

Plaintiff argues that the email was protected activity because it was not "disruptive" of Genentech's business operations.  For support, he cites Hochstadt v. Worcester Foundation for Experimental Biology, 545 F.2d 222, 230 (1st Cir. 1976), and

21

United States District Court
For the Northern District of California

_Matima_, 228 F.3d at 81.  Neither of these cases stands for the proposition that all non-disruptive activity is protected.  Nothing in the law precludes Genentech from enforcing its legitimate policies and counseling Plaintiff for writing an email that violated these policies.  Therefore, the Court concludes that Plaintiff's email was not protected activity.

Further, even if the email were protected, Plaintiff has not presented evidence that there was a causal link between it and Defendant's decision to terminate him.  Plaintiff was terminated for his continued insubordinate conduct _after_ writing the email.  The notice of misconduct issued to him in response to his email required him to apologize for the email.  He refused to do so.  Further, in the weeks after sending the email, he continued to challenge Slattery's authority and was increasingly difficult to manage.  For instance, in response to a request to address a problem with the Harte-Hanks reports, Plaintiff told Slattery that she did not know what she was talking about.  He also refused to meet Slattery in her office and accused her of needing to have Bartlett act as a bodyguard in a meeting.  Richardson Decl., Ex. A, 258:12-19; Exs. Q, S.  Without a causal link, Plaintiff has not established a _prima facie_ case for retaliation.

In sum, Plaintiff has not presented evidence that he was terminated for engaging in protected activity.  Accordingly, Plaintiff's retaliation claim fails.

III. Punitive Damages

In California, a plaintiff may seek punitive damages if, in an action not arising from a breach of contract, "it is proven by

**United States District Court**
For the Northern District of California

clear and convincing evidence that the defendant has been guilty of
oppression, fraud, or malice." Cal. Civ. Code § 3294(a). A
corporate employer may not be held liable for such damages arising
from the acts of an employee unless "an officer, director, or
managing agent of the corporation . . . had advance knowledge of
the unfitness of the employee and employed him or her with a
conscious disregard of the rights or safety of others or authorized
or ratified the wrongful conduct for which the damages are awarded
or was personally guilty of oppression, fraud, or malice." Id.
§ 3294(b). Managing agents are "those corporate employees who
exercise substantial independent authority and judgment in their
corporate decisionmaking so that their decisions ultimately
determine corporate policy." White v. Ultramar, Inc., 21 Cal. 4th
563, 567 (1999). These are policies that "affect a substantial
portion of the company and that are the type likely to come to the
attention of corporate leadership." Roby v. McKesson Corp., 47
Cal. 4th 686, 714 (2009). Whether employees exercise sufficient
authority is determined on a case-by-case basis. White, 21 Cal.
4th at 567.

Because Genentech is a corporate employer, Plaintiff must
satisfy the requirements of section 3294(b). He asserts that
Chavaree's conduct satisfied section 3294(b) because she is a
managing agent with "the authority to terminate employees" and she
was "the highest authority available to Mr. Buchanan." Opp. at 12-
13. Whether "a supervisor is a managing agent within the meaning
of Civil Code section 3294 does not necessarily hinge on their
level in the corporate hierarchy." Myers v. Trendwest Resorts,

23

1    Inc., 148 Cal. App. 4th 1403, 1437 (2007) (citation and internal

2    quotation marks omitted).  "Rather, the critical inquiry is the

3    degree of discretion the employees possess in making decisions that

4    will ultimately determine corporate policy."  Id. (citation and

5    internal quotation marks omitted).  Defendant presents evidence

6    that Chavaree does not have any power to "set or alter any of

7    Genentech's policies applicable to all employees."  Chavaree Decl.

8    ¶ 20.  Plaintiff does not present any evidence to the contrary and

9    offers no probative evidence as to this inquiry.  Consequently, he

10   cannot seek punitive damages based on a theory that Chavaree was a

11   managing agent who acted maliciously against him or who ratified

12   the actions of others who acted maliciously against him.

13                              CONCLUSION

14        For the foregoing reasons, the Court grants Defendant's motion

15   for summary judgment.  The clerk shall enter judgment and Plaintiff

16   shall bear Defendant's costs.

17        IT IS SO ORDERED.

18

19   Dated: 08/31/10          _____

20                            CLAUDIA WILKEN
                              United States District Judge

21

22

23

24

25

26

27

28                                24